# Illinois Official Reports

## Appellate Court

---

### *People v. Palmer*, 2019 IL App (4th) 190148

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES B. PALMER, Defendant-Appellant. |
| | |
| District & No. | Fourth District<br>No. 4-19-0148 |
| | |
| Filed | November 27, 2019 |
| | |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 99-CF-139; the Hon. Jeffrey S. Geisler, Judge, presiding. |
| | |
| Judgment | Affirmed. |
| | |
| Counsel on Appeal | Arthur Loevy, Jon Loevy, Steve Art, Rachel Brady, and Alison Leff, of Loevy & Loevy, of Chicago, for appellant.<br><br>Jay Scott, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and Luke McNeill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | JUSTICE CAVANAGH delivered the judgment of the court, with opinion.<br>Justices Knecht and Turner concurred in the judgment and opinion. |

**OPINION**

¶ 1    Charles B. Palmer petitioned the Macon County circuit court for a certificate of innocence. The court denied his petition. Palmer appeals. We affirm the judgment because we are unable to say it is an abuse of discretion.

## I. BACKGROUND

### A. The Charges (February 1999)

¶ 4    The information against Palmer had six counts, the first five of which accused him of committing the first degree murder of William Helmbacher. Specifically, according to counts I to V, Palmer did the following on August 27, 1998: (1) "with the intent to kill or do great bodily harm to [Helmbacher], repeatedly struck [him] on the head, thereby causing [his] death" (count I); (2) "repeatedly struck [Helmbacher] on the head, knowing said act would cause the death of [Helmbacher], thereby causing [his] death" (count II); (3) "repeatedly struck [Helmbacher] [o]n the head, knowing such act created a strong probability of death or great bodily harm to [Helmbacher], thereby causing [his] death" (count III); (4) "while committing or attempting to commit a forcible felony, [r]obbery, *** repeatedly struck [Helmbacher] on the head and thereby caused [his] death" (count IV); and (5) "while committing or attempting to commit a forcible felony, [r]esidential [b]urglary, *** repeatedly struck [Helmbacher] on the head and thereby caused [his] death" (count V). See 720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (1998).

¶ 5    In the remaining count, count VI, the State alleged that on the day before the murder, August 26, 1998, Palmer committed residential burglary of Helmbacher's apartment (*id.* § 19-3).

### B. The Jury Trial (April 2000)

#### 1. *The Testimony of Ray Taylor*

##### a. The Burglary of Helmbacher's Apartment on August 26, 1998

¶ 9    Ray Taylor, a first cousin of Palmer, testified that he lived in an apartment building in Decatur, upstairs from the apartment that Helmbacher had occupied, and that around dusk on August 26, 1998, Palmer came to Taylor's apartment and told him he was going to break into Helmbacher's apartment.

¶ 10    The two of them, Palmer and Taylor, went downstairs. Palmer entered Helmbacher's apartment through a window and, from the inside, opened the front door and asked Taylor to keep watch for him. Taylor "stood there, and then *** went upstairs," returning to his own apartment.

¶ 11    Soon afterward, Palmer came upstairs to Taylor's apartment, bringing with him some bottles of beer and a jar with change in it, among other things. He asked Taylor for a bag, and Taylor handed him a plastic garbage bag. Palmer put some of the things in the bag, and he and Taylor drank some of the beers.

¶ 12    Later, the two of them walked to a dumpster, a few blocks from Taylor's apartment, and Taylor threw the garbage bag into the dumpster.

¶ 13    Taylor then went to his mother's residence and did not see Palmer again that night.

¶ 14                    b. Taylor Sees Palmer the Next Evening, August 27, 1998

¶ 15    On the evening of August 27, 1998, Taylor saw Palmer at the apartment of another cousin of Taylor's, John Bradford. Palmer asked Taylor to come in, and upon entering, Taylor noticed that Palmer was wearing different shoes and different clothes from those he had been wearing the day before, and Taylor further noticed that the shoes Palmer now had on were too small, with his heels protruding out of the back of them. By way of explanation, Palmer told Taylor, " 'Man, you know I had to beat the dude to death.' " " 'What dude?' " Taylor asked. It was the man in the apartment downstairs from Taylor's apartment, Helmbacher, Palmer answered— adding regretfully Helmbacher had only $11 on him as it turned out. Taylor asked Palmer where his new tennis shoes were, the ones he was wearing the previous day. Palmer replied that " 'blood was everywhere.' "

¶ 16                             c. Police Interrogations of Taylor

¶ 17    Later in the evening of August 27, 1998, the police came to Taylor's apartment and questioned him about Helmbacher's murder, and on September 1, 1998, the police questioned him again. In those first two interviews, Taylor, who was unwilling to get involved, divulged nothing of what he had heard about Helmbacher's murder.

¶ 18    Taylor became more cooperative later in September 1998, when the police approached him a third time and informed him that (1) a garbage bag containing property stolen from Helmbacher had been found and (2) Taylor's fingerprints were on the bag. This time, Taylor told the police what he knew about Palmer's participation in the burglary and the murder. In an interview room off the booking area, a police officer showed Taylor a pair of tennis shoes, and at that time Taylor identified them as the shoes Palmer was wearing on August 26, 1998, the day before the murder, when Palmer burglarized Helmbacher's apartment.

¶ 19                    d. No Specific Promises Made to Taylor by the State

¶ 20    Taylor, who had two prior felony convictions, acknowledged that in Macon County case No. 98-CF-1476, he faced a charge of residential burglary (*id.*) because of his participation in the August 26, 1998, burglary of Helmbacher's apartment. Taylor denied, however, that the State had made any specific promises to him in return for his testimony in the present case. All the State had told him was that his testimony would be taken into account.

¶ 21                             2. *The Testimony of Joseph Moyer*

¶ 22    Joseph Moyer testified that, in August 1998, both he and Helmbacher were employees of Douglas Lee and that on the evening of August 27, 1998, Moyer and Lee were collecting rent from occupants of apartment buildings owned by Lee.

¶ 23    At about 9:45 p.m., as they were making their rounds, Moyer and Lee arrived at Helmbacher's apartment and knocked on the door. No one answered. They left to collect rent at other buildings.

¶ 24    At 10:30 p.m. or 10:45 p.m., they returned to Helmbacher's apartment. Lee peered through a small window in the front door and saw a half-eaten cheeseburger on a table and

Helmbacher's shoes on the floor. Suspecting that something was amiss, Lee opened the door, and Helmbacher was dead on the floor, right in front of them.

Moyer, who had a previous felony conviction for burglary, admitted that Lee was angry with Helmbacher the night of August 27, 1998, because Helmbacher had fallen behind in collecting rent for Lee.

### 3. *The Testimony of Brian Cleary*

Brian Cleary, a Decatur police officer, testified that on the evening of August 27, 1998, he responded to a call at Helmbacher's apartment. Upon arriving there, Cleary looked through a window and saw Helmbacher lying on the floor. Cleary saw no signs of forced entry.

### 4. *The Testimony of Roger Ryan*

On August 27 and 28, 1998, a Decatur detective, Roger Ryan, investigated the scene of the murder. The inside of the door to Helmbacher's apartment was splattered with blood, and blood had pooled around Helmbacher's body. A hammer lay nearby. Ryan saw no bloody footprints nor did he see any blood outside the apartment.

### 5. *The Testimony of Travis Hindman*

A forensic pathologist, Travis Hindman, had performed an autopsy on Helmbacher's body. The cause of Helmbacher's death, Hindman testified, was brain trauma resulting from narrow-surface blunt trauma to the head. The head wounds were compatible with blows from a hammer.

### 6. *The Testimony of Mike Callaway*

According to Mike Callaway's testimony, Palmer spent the night of August 27, 1998, with him. When Palmer arrived at Callaway's apartment that night around 10 p.m., Callaway did not notice any blood on him. (After the passage of two years, Callaway was unsure whether he had told a Decatur detective, Tim Carlton, that it was just before dark when Palmer arrived at his apartment, but that could have been what he had told Carlton, Callaway agreed.)

Sometime that evening, after Palmer's arrival, Callaway went to a liquor store, and about 45 minutes later, when Callaway returned, Palmer was wearing one of Callaway's shirts. Callaway told Palmer he had to wash his own clothes and wear them. Later, during Palmer's stay at his apartment, Callaway saw him washing clothes.

### 7. *The Testimony of Tim Carlton*

According to Tim Carlton's testimony, Callaway told him, in an interview, that it was around dark on August 27, 1998, when Palmer arrived at his apartment.

On September 22, 1998, Carlton interviewed Palmer. At the time of the interview, Palmer was wearing a pair of white tennis shoes with red specks on them. Carlton took the shoes from Palmer and showed them to Taylor. Then Carlton put the shoes in evidence storage.

Later, the shoes were sent to the Illinois State Police crime laboratory for analysis. Initial testing found no human blood on the shoes. Then, without touching the shoes, Carlton had them sent back to the crime laboratory with instructions to "take them apart" and analyze them

again.

### 8. *The Testimony of Roger Morville*

On September 24, 1998, Roger Morville, the evidence officer for the Decatur Police Department, transported Palmer's tennis shoes to the crime laboratory. After the initial testing, Morville transported the shoes from the laboratory back to the evidence storage area of the Decatur Police Department. On October 15, 1998, he again transported the shoes from evidence storage to the crime laboratory. At that time, the shoes were still in a sealed evidence storage bag, and they had not been tampered with or altered.

### 9. *The Testimony of Jennifer Lu*

Jennifer Lu was a crime laboratory employee trained in forensic biology. On September 25, 1998, she performed the initial analysis on Palmer's tennis shoes, testing only the red specks on the laces and on the outside of the shoes. Lu determined that these red specks on the exterior of the shoes were not human blood.

On November 4, 1998, at the request of the Decatur Police Department—an unprecedented request, in her experience—Lu disassembled the shoes and then reexamined them, looking for previously hidden blood on the pieces. She now found three stains on the right side of the right shoe: The first stain was under a piece of leather covered with mesh, and the other two stains were under the mesh. Lu tested these stains and found all three of them to be human blood.

There also was a blood-like substance in Helmbacher's fingernail scrapings, which the Decatur Police Department likewise had sent to the crime laboratory. Lu, however, did not test the fingernail scrapings.

### 10. *The Testimony of Dana Pitchford*

Dana Pitchford, a forensic scientist for the Illinois State Police, performed a DNA analyses of (1) a blood standard from Helmbacher and (2) the bloodstains that Lu had found on Palmer's right shoe. The DNA analysis showed that the three bloodstains on Palmer's shoe were Helmbacher's blood. The likelihood that someone other than Helmbacher could have been the source of the bloodstains was 1 out of 42 trillion in the "White" population and 1 out of 38 trillion in the "Black" population. (Helmbacher was "White.")

### 11. *The Testimony of Brian Bell*

The defense called Brian Bell, a Decatur police sergeant, who testified that on September 21, 1998, he interviewed Taylor and Taylor admitted going into Helmbacher's apartment during the burglary of August 26, 1998.

### 12. *The Testimony of Jeremy Welker*

The defense also called Jeremy Walker, another Decatur police officer, who testified that when he interviewed Taylor on August 28, 1998, Taylor told him he was home the evening of August 27, 1998, and that he heard nothing unusual that evening.

¶ 51                                    13. *Palmer's Testimony*

¶ 52        Palmer took the stand in his own behalf and denied committing the charged offenses. He testified that, instead, he spent the day and night of August 26, 1998, in Taylor's apartment, drifting in and out of sleep because he had been feeling unwell. On August 27, 1998, he woke up between 11 a.m. and noon, still feeling sick, and around 3:30 p.m. or 4 p.m. he went to Callaway's apartment, where he stayed until the next day.

¶ 53        In Callaway's apartment, Palmer put on some pants and a shirt belonging to Callaway. He and Callaway often wore one another's clothing, Palmer testified.

¶ 54        Palmer denied lending his shoes to anyone, but he suggested that someone might have worn his shoes without his permission.


¶ 55                                    14. *The Verdict and the Sentence*

¶ 56        On April 27, 2000, the jury returned two verdicts.

¶ 57        One of the verdicts read as follows: "We, the jury, find the defendant, Charles B. Palmer, not guilty of residential burglary."

¶ 58        The other verdict read as follows: "We, the jury, find the defendant, Charles B. Palmer, guilty of First Degree Murder."

¶ 59        On May 8, 2000, for the first degree murder charged in count I (*id.* § 9-1(a)(1)), the circuit court sentenced Palmer to natural life imprisonment.


¶ 60                                    C. The Direct Appeal (September 2001)

¶ 61        Palmer took a direct appeal, in which he made three arguments. *People v. Palmer*, No. 4-00-0634, slip order at 1 (2001) (unpublished order under Illinois Supreme Court Rule 23).

¶ 62        First, Palmer argued that the State had failed to prove him guilty, beyond a reasonable doubt, of first degree murder. *Id.* In so arguing, he claimed that the blood on his shoe had been " 'discovered under suspicious and questionable circumstances.' " *Id.* at 10. Finding that "*[n]othing* in the record support[ed] that claim," the appellate court decided the evidence was sufficient to support the conviction. (Emphasis in original.) *Id.*

¶ 63        Second, Palmer argued that the prosecutor, in his rebuttal argument, committed an impropriety by characterizing defense counsel's closing argument as " 'smoke and mirrors.' " *Id.* at 11. The appellate court held that not only had Palmer procedurally forfeited this issue by omitting to object during the prosecutor's rebuttal argument (*id.* at 13) but the smoke and mirrors metaphor was a fair response to defense counsel's closing argument (*id.* at 15), a response that stopped short of disparaging defense counsel's integrity (*id.* at 16).

¶ 64        Third, Palmer claimed that the circuit court had erred by instructing the jury on attempted residential burglary, attempted robbery, and robbery. *Id.* He argued that those instructions had "misled the jury [by] impl[ying] that he was guilty of three other crimes with which he was never charged." *Id.* The appellate court disagreed. *Id.* Because the State had charged Palmer in count IV with killing Helmbacher while committing or attempting to commit robbery and in count V with killing Helmbacher while committing or attempting to commit residential burglary, it was necessary to instruct the jury on the predicate offenses of robbery, attempted robbery, and attempted residential burglary. *Id.* at 17. The information notified Palmer, before the trial, that the State would proceed under a felony murder theory as set forth in counts IV

and V, so he was not misled or surprised. *Id.* at 19. Nor would he be put in jeopardy twice for the same offense. *Id.*

¶ 65    Thus, disagreeing with all three of Palmer's arguments on direct appeal, the appellate court affirmed the judgment. *Id.*

### D. The First Postconviction Proceeding (August 2002)

¶ 66

¶ 67    On August 18, 2002, Palmer petitioned for postconviction relief.

¶ 68    On August 28, 2002, the circuit court summarily dismissed the petition "as being frivolous and patently without merit because it was not timely filed."

¶ 69    On September 11, 2002, Palmer moved for reconsideration, and on October 16, 2002, while a ruling on that motion for reconsideration was still pending, he filed a second motion for reconsideration, now citing the supreme court's decision in *People v. Boclair*, 202 Ill. 2d 89 (2002).

¶ 70    On November 12, 2002, the circuit court granted the motion for reconsideration and vacated the original summary dismissal only to summarily dismiss the postconviction petition again, this time on the basis of its substance instead of its lateness.

¶ 71    Palmer appealed, and in his appellate brief, he made essentially four arguments.

¶ 72    First, Palmer argued that a detective " 'plant[ed] blood' " on the right tennis shoe after a crime laboratory employee analyzed both shoes and determined that the stains on them were not human blood. *People v. Palmer*, 352 Ill. App. 3d 877, 884 (2004). In response, the appellate court reminded Palmer that on direct appeal the appellate court rejected his claim that the blood on his shoe was " 'discovered under suspicious and questionable circumstances.' " *Id.* Palmer "simply [was] rephras[ing] an issue previously addressed on direct appeal," and a defendant "[could not] avoid *res judicata* by adding additional allegations that [were] encompassed by a previously adjudicated issue." *Id.*

¶ 73    Second, Palmer argued that because Helmbacher had been an attorney and because trial counsel had acknowledged knowing Helmbacher professionally, Palmer was denied his right to conflict-free representation. *Id.* at 884-85. The appellate court disagreed: Trial counsel "had no previous relationship with the victim that would give rise to divided loyalties." *Id.* at 885.

¶ 74    Third, Palmer argued that trial counsel had rendered ineffective assistance by failing to call several named witnesses. *Id.* Palmer, however, had failed to support that claim by providing affidavits from the witnesses. *Id.*

¶ 75    Finally, Palmer argued, "the trial court [had] erred by 'allowing [the State] to proceed to trial with insufficient evidence.' " *Id.* Specifically, he argued, "the State [had] failed to conduct tests on substances found under the victim's fingernails," and, consequently, the State " 'ha[d] imprisoned the wrong man.' " *Id.* The appellate court regarded this as another argument recycled from the direct appeal. The decision on direct appeal had "rejected [Palmer's] argument that the State failed to prove him guilty beyond a reasonable doubt of first degree murder," and "[s]ince [Palmer's] argument ha[d] already been addressed, the trial court did not err in summarily dismissing [his] postconviction petition." *Id.*

### E. The First Petition for DNA Testing and the Results of the Testing

¶ 76

¶ 77    On June 10, 2010, pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2010)), Palmer petitioned for the forensic testing of any DNA that

might be found on previously untested items of evidence, including fingernail scrapings, the handle of the hammer, doorframe swabs, and pulled head hairs.

¶ 78 The State moved to dismiss Palmer's petition for DNA testing, and on June 13, 2011, the circuit court held a hearing on the State's motion. In the hearing, the court noted that the victim, Helmbacher, had defensive wounds as if he had fought with his assailant; therefore, the court decided that a DNA analysis of the scrapings taken from under Helmbacher's fingernails would be materially relevant. (But the court allowed the State's motion for dismissal as to the other items of evidence.)

¶ 79 In 2013, pursuant to the circuit court's ruling, Cellmark Forensics performed a DNA test of the fingernail scrapings and set forth its findings in a report dated January 22, 2014. According to the report, the fingernail scrapings from the right hand revealed two profiles: one from Helmbacher and the other from a foreign contributor. Both Palmer and Taylor were excluded as being possible contributors of the DNA profile found under the fingernails of Helmbacher's right hand.

¶ 80 F. The Second Petition for DNA Testing and the Results of the Testing

¶ 81 On June 3, 2014, Palmer petitioned for further DNA testing, this time on "the hairs and blood-like substance found in the bags that were placed around the hands of the victim."

¶ 82 On October 9, 2014, the circuit court granted this second petition for DNA testing and on December 1, 2014, followed up with a written order.

¶ 83 In a report dated April 7, 2016, Cellmark announced its findings: Two of the hairs yielded no data, but a third hair came from someone other than Palmer or Helmbacher.

¶ 84 G. The Successive Postconviction Proceeding

¶ 85 On July 27, 2016, citing the results of the DNA testing, Palmer moved for permission to file a successive petition for postconviction relief. See 725 ILCS 5/122-1(f) (West 2016). The remedy the proposed successive petition sought was a new criminal trial.

¶ 86 On October 5, 2016, the circuit court granted permission to file the proposed successive petition.

¶ 87 On November 16, 2016, the State confessed the successive petition, and the circuit court granted the prayer of the petition: a new trial. Accordingly, the court vacated the judgment and sentence on count I of the information; reinstated counts II, III, IV, and V; set bond at $1 million; and put the case on another judge's trial call.

¶ 88 H. The State's Motion to Dismiss the Charges Without Prejudice

¶ 89 On November 23, 2016, after a follow-up investigation, the State moved for the dismissal of the charges, without prejudice, because (to quote from the State's motion) "the State ha[d] determined that there [was] insufficient evidence to prove this case beyond a reasonable doubt."

¶ 90 On the same date, the circuit court granted the State's motion for dismissal, vacating and dismissing all counts of the information.

¶ 91        I. Palmer's Amended Petition for a Certificate of Innocence:
                    His Arguments and the State's Counterarguments

¶ 92        On August 30, 2018, Palmer filed an amended petition for a certificate of innocence, with documentary evidence attached. On November 9, 2018, the State filed a response, likewise with documentary evidence attached. On February 6, 2019, Palmer filed a supplemental brief in support of his amended petition.

¶ 93        The contentions and opposing contentions were substantially as follows.

¶ 94        1. *Palmer's Theory That a Different Pair of Shoes Was Substituted for the Shoes the Police Took From Him*

¶ 95                            a. Palmer's Argument

¶ 96        In Palmer's view, the evidence in the jury trial was contradictory as to whether the shoes that were tested and on which Helmbacher's blood was found were the same shoes that Decatur Detective Tim Carlton took from him on September 22, 1998. There were varying descriptions of what color the shoes were. The laboratory report described the shoes as "black and white." Taylor testified, however, that the shoes the police officers showed him at the jail "were red and white as far as [he] remember[ed]." Likewise, Palmer testified he used to have "a pair of red and white shoes." Carlton described the shoes as being "white" and as having "Fila marks."

¶ 97                         b. The State's Counterargument

¶ 98        Carlton testified that after interviewing Taylor, he "was looking for Fila tennis shoes." Carlton noticed that Palmer was wearing white tennis shoes with Fila marks when he interviewed Palmer on September 22, 1998, about a month after the murder. Carlton took the shoes from Palmer and showed them to Taylor. Upon being shown the shoes, Taylor, according to his own testimony, told the police "they were the shoes that [Palmer] had on" "the day of the burglary." After being so informed by Taylor, Carlton put the shoes in a bag (Carlton testified) and delivered them to the evidence room, without altering them. The shoes that the State presented as an exhibit in the criminal trial were the same shoes that Carlton had taken from Palmer.

¶ 99        2. *Palmer's Theory That After the First Test Found Nothing, the Police Planted Helmbacher's Blood on the Shoes Before Sending Them Back to the Crime Laboratory for Another Test*

¶ 100                           a. Palmer's Argument

¶ 101       Because Helmbacher was struck by a hammer 20 times and the murder scene was gory with his blood, Palmer argued "[i]t was impossible that there would be no blood found on a pair of shoes used in such a crime." Lu found no blood in her first testing of the shoes, and she sent the shoes back to the Decatur Police Department along with her negative finding. Two weeks then passed, during which (Palmer represented to the circuit court) the police department had simultaneous access to the shoes and to "Helmbacher's blood standard and other physical evidence containing Helmbacher's blood." After the passage of those two weeks, the police department sent the shoes back to the crime laboratory, this time with a request that Lu tear the shoes apart and then retest them. Lu testified she had never before received such a request. Nevertheless, she disassembled the shoes, as requested, and "found

three pinpoints of blood: one under a piece of leather with mesh over it and two under mesh—certainly not what would be expected in such a violent, bloody crime," Palmer added. Therefore, in his view, "[t]he only way that this blood could have appeared on [his] shoes [was] if it was put there." The blood was, he claimed, "planted."

¶ 102                            b. The State's Counterargument

¶ 103     The negative finding in the first test was explainable, the State argued, because judging from the new DNA evidence, Palmer was not the primary assailant of Helmbacher. If, instead of being the wielder of the hammer, Palmer had been an accessory, standing off to the side, his shoes would not necessarily have become drenched in Helmbacher's blood. With blood spattering everywhere, though, tiny droplets could well have landed on Palmer's shoe and rolled into crevices and seams of the shoe.

¶ 104     The request for retesting likewise was explainable, the State argued—and it already had been explained in the jury trial. When the shoes were sent to the crime laboratory the first time, the laboratory request sheet called for testing to be done only on some reddish-brown stains, the red specks, on the outside of the shoes. This initial written direction was a mistake and contrary to Carlton's intent: He had wanted all along for the shoes to be thoroughly examined, inside and out. Consequently, after the shoes came back with the mere finding that the stains on the outside were not blood, Carlton had the shoes sent back to the crime laboratory to be torn apart and then examined and tested, in accordance with his original intent.

¶ 105     In all the trips the shoes took back and forth between the Decatur Police Department and the crime laboratory, they were sealed in an evidence bag. Also, whenever the police department had custody of the shoes, they were kept in a sealed condition in the department's evidence area, to which only the evidence officer, Moville, had access. (The other evidence officer was away from the police department in August and September 1998.) The State established all this by citation to Moville's trial testimony.

¶ 106     Even if one disbelieved Moville (although there was no reason to disbelieve him), another difficulty with Palmer's planting theory, the State argued, was that Helmbacher's blood standard was kept at the crime laboratory instead of at the Decatur Police Department. "Helmbacher's blood standard and [Palmer's] Fila tennis shoes were never simultaneously in the custody of the Decatur Police Department between the first and second examinations, contrary to [Palmer's] claims." Rather, as Lu testified, "Helmbacher's *dried* blood standard remained at the crime lab and was not returned to the police department." (Emphasis added.) As a matter of fact, Helmbacher's blood standard was still at the crime laboratory at the time of the jury trial. " 'And you still have that card in the Springfield Forensic Science Lab?' " Lu was asked at trial. " 'Correct,' " she answered.

¶ 107                    3. *Palmer's Suggestion That Douglas Lee*
                    *Should Be Suspected of Murdering Helmbacher*

¶ 108                            a. Palmer's Argument

¶ 109     Helmbacher worked for Lee not only as an attorney in Lee's law firm but also as a kind of property manager, helping Lee with the collection of rent. Lee was disgruntled with Helmbacher because, in his opinion, Helmbacher had not been turning over to him enough of the rent money. And Helmbacher, for his part, was disgruntled with Lee because, in his

opinion, Lee had not been sharing enough of the profits of the law business with him. Helmbacher and Lee had planned to meet in the evening on August 27, 1998, to discuss these differences, and in the planned meeting, Lee had intended to dispense with Helmbacher's services as a property manager. In fact, that very evening, Lee himself had been going around to different tenants, angrily trying to collect the rent himself and telling them to pay the rent from now on to him instead of to Helmbacher. While denying any involvement in Helmbacher's murder, Lee admitted to the Decatur police that he had been to Helmbacher's apartment on three separate occasions the night of the murder. He had knocked on Helmbacher's door, he told the police, but had been unable to raise anyone. Finally, on the third visit, Lee used his master key to let himself into Helmbacher's apartment. (Lee owned the apartment building and, when he was in town, sometimes spent the night in Helmbacher's apartment.) When Lee pushed open the front door, he and the man with him, Moyer, saw Helmbacher's body on the floor, just inside the front door.

¶ 110 When investigators requested to take Lee's fingerprints, Lee invoked his right to counsel and stopped cooperating with them.

¶ 111 The day after Helmbacher's murder, Lee telephoned an old friend, Jane Redenberg, and talked to her about Helmbacher's death. He told Redenberg that he was alone when he discovered Helmbacher's body (whereas, according to Lee's statement to the Decatur police, Moyer was with him), that Helmbacher had committed suicide (whereas it was obvious that Helmbacher had been beaten to death with the hammer that lay near his body), and that he had found Helmbacher's body in the back bedroom of the apartment (whereas he found Helmbacher's body just inside the front door). In recounting to the Decatur police what Lee had told her, Redenberg mentioned that Lee had been seeing a psychiatrist, that he was having marital problems, and that he had been acting strangely.

¶ 112 "In 2017," Palmer wrote in his amended petition, "a forensics lab compared the DNA from the hairs and fingernail scrapings with Doug Lee's DNA. The results excluded Doug Lee as a contributor to the hair, but did not exclude him as a contributor to the DNA found under Helmbacher's fingernails."

¶ 113                          b. The State's Counterargument

¶ 114 The State quoted from Cellmark's report on the DNA analysis of the fingernail scrapings: "The report reads, 'due to the possibility of allelic drop out, *no conclusions can be made* on this mixture profile.'" (Emphasis added.) Thus, the State argued, "the report [did] not read that Doug Lee [could not] be excluded," contrary to Palmer's representation. "More accurately, [the report] state[d] that no conclusions [could] be drawn at all."

¶ 115                  4. *Palmer's Attacks on Taylor's Credibility*
¶ 116                          a. Palmer's Argument
¶ 117 Palmer characterized Taylor as "a person of dubious credibility," not only because Taylor had "multiple prior felony convictions" and not only because, before implicating Palmer, Taylor repeatedly denied to the police that he knew anything about the murder. What also made Taylor unreliable was his need to save his own skin. When the police found Taylor's fingerprints on the garbage bag containing Helmbacher's stolen goods, Taylor needed to get the police off his case by offering them an alternative, bigger win. Taylor, Palmer argued, "had

every reason to point the finger at Mr. Palmer: His fingerprints were found on a bag full of the victim's stolen belongings[,] and he was facing other criminal charges (which were dismissed after he implicated at [*sic*] Mr. Palmer)." Taylor himself, according to Palmer, had been "a suspect in the murder."

¶ 118    After all, Palmer argued, by murdering Helmbacher, Taylor would have done just what he threatened to do a few months before. "A few months before the murder," Palmer wrote, citing an attached police report, "Taylor had gotten into a fight with Helmbacher and Lee in the middle of the night. During the fight, Taylor threatened to kill both Helmbacher and Lee, and [the Decatur Police Department] arrested Taylor for assault, disorderly conduct, and resisting arrest."

¶ 119                                   b. The State's Counterargument

¶ 120    The State argued that Taylor's reluctance to implicate Palmer in Helmbacher's murder could have been owing to the close relationship that Taylor had with Palmer: They were first cousins, and Palmer often resided in Taylor's apartment.

¶ 121    Palmer's theory was that, despite their close relationship, desperation drove Taylor to falsely implicate him. That theory, the State countered, was implausible because Taylor had no reason to think that he himself was seriously suspected of murdering Helmbacher. Granted, Taylor was a suspect in the residential burglary of Helmbacher's apartment (because of the discovery of Taylor's fingerprints on the garbage bag), but that was a long way from making Taylor a suspect in Helmbacher's murder. The residential burglary was over and done with the day before Helmbacher was murdered, and there was no objective reason to think that one crime had anything to do with the other.

¶ 122    To be sure, the charge Taylor was facing, residential burglary, was a serious offense, but it was unrebutted that no promise of leniency had been made to him in return for his testimony against Palmer. The State had promised Taylor only that his cooperation would be taken into account. Thus, Taylor had nothing definite to gain from implicating his first cousin.

¶ 123    And, besides, the State argued, Taylor was not the only trial witness whose credibility could be called into question: Some key parts of Palmer's testimony made no sense and were hard to believe.

¶ 124    For instance, Palmer testified that on August 26, 1998, the day of the burglary, he was so sick he could not keep anything down and he spent the day on Taylor's couch, drifting in and out of sleep. This sickness, Palmer testified, persisted throughout the next day, August 27, 1998, the day of Helmbacher's murder, and Palmer remained so nauseated that, around noon, he still did not dare put anything in his stomach except broth. Around 2:30 p.m. or 3 p.m., however, despite his supposed queasiness, Palmer exited the apartment building when he saw a friend of his, Robert Martin, rolling down the street outside in his wheelchair, and Palmer visited with Martin and even drank beer with him.

¶ 125    Indeed, Martin himself testified that around 2 p.m. on August 27, 1998, he was present with Palmer and Taylor and that all three of them drank beer. Martin had no recollection of Palmer's saying he was sick or acting as if he were sick.

¶ 126    The State thought it also was inconsistent with Palmer's claimed illness that, according to his testimony, he left the apartment building at 3:30 p.m. or 4 p.m. on August 27, 1998—he never explained why he left—and went to his friend Michael Callaway's house "for the rest of

that day, and that night until the next day." After arriving at Callaway's house, Palmer bought some beer for Callaway and, as Palmer put it, "stayed at Mike's all that night, all that day[,] because [he] was sick. If [he] hadn't been sick, [he] probably wouldn't have stayed that long." That testimony made no sense to the State because if Palmer really were sick, he surely would not have left Taylor's apartment in the first place. There was no testimony that Taylor had asked his ailing first cousin to leave or that Taylor had hinted he was overstaying his welcome—and Palmer had been sociably drinking beer with Taylor and Martin just that afternoon.

¶ 127    Also troubling to the State was a conflict between Palmer's testimony and Callaway's testimony on a crucial point. On the one hand, Palmer testified he arrived at Callaway's apartment between 3:30 and 4 p.m., which, in August, would have been well within daylight hours. On the other hand, Callaway testified that although he was uncertain of the exact time when Palmer arrived at his house, it was around 10 p.m. and, in any event, it was dark out when Palmer arrived.

¶ 128    Why does it matter so much whether Palmer arrived at Callaway's house in the afternoon of August 27, 1998, or in the evening? It matters because Helmbacher was murdered sometime between 7 p.m. and 11 p.m. on August 27, 1998. Tonya Estes last saw Helmbacher alive at 7 p.m. that day; she saw him sitting in his living room, reading. Lee and Moyer discovered Helmbacher's body at 11 p.m. The State suggested that Palmer had lied about when he arrived at Callaway's apartment because, being an accessory to Helmbacher's murder, he knew the murder had happened in the evening and, therefore, it was crucial that he convince the jury he arrived at Callaway's apartment before then, in the afternoon.

¶ 129    Something Palmer did after arriving at Callaway's apartment made no sense to the State, either, unless Palmer had felt an urgent need to dispose of his possibly blood-spattered clothing. After Palmer arrived at Callaway's apartment and Callaway left to go to the liquor store, Palmer took off his own shirt and pants and put on a shirt and some pants belonging to Callaway. Palmer testified it was not unusual for him and Callaway to wear each other's clothes, but that is not the impression one gets from Callaway's testimony: He testified that when he returned from the liquor store and saw Palmer wearing his shirt and pants, he told Palmer to wash his own clothes and wear them. And what was stranger or more suspicious, in the State's view, was that Palmer had to wash Callaway's shirt and pants before putting them on. If both Palmer's clothing and Callaway's clothing were dirty, the State reasoned, Palmer might as well have washed his own clothing and worn it—unless he was worried that washing might not be good enough and that bloodstained clothing was best thrown away. (We note, however, Callaway's testimony that later during Palmer's stay in his apartment, he saw Palmer washing clothes. And Palmer kept his shoes.)

¶ 130                    J. The Circuit Court's Decision on Palmer's
                        Amended Petition for a Certificate of Innocence

¶ 131    On February 14, 2019, the circuit court entered an order denying Palmer's amended petition for a certificate of innocence. The order explained why the court had arrived at that decision. Some of the stated reasons were as follows.

¶ 132    First, although the circuit court had reviewed Taylor's testimony "with caution," Taylor was Palmer's first cousin, and according to Taylor's testimony, Palmer told him he had " 'beat[en] the dude to death' " and that " 'the guy didn't have but $11.00.' "

¶ 133    Second, the circuit court acknowledged Palmer's argument "that the shoes collected by the police were a different color than the ones collected by Detective Carlton from [Palmer], but the court [found] that [it was] more likely than not that these were the shoes Ray Taylor told the investigators that Charles Palmer was wearing prior to William Helmbacher being killed."

¶ 134    Third, upon tearing the shoes apart, Lu found three stains, one of which "contained a sufficient amount of DNA for comparison and matched the blood standard of William Helmbacher."

¶ 135    Fourth, Palmer had not presented any evidence that the Decatur Police Department had planted the blood on the shoes "other than the argument that the state crime lab did not find any blood the first time and it was not until the shoes were sent back a second time that the blood stain [sic] was found suitable for comparison." Just because, according to Lu's testimony, it was unusual for a police department to request that shoes be torn apart and retested, that had no tendency to prove the Decatur Police Department had planted the blood.

¶ 136    Fifth, Palmer was in the same building the day Helmbacher was killed.

¶ 137    Sixth, Palmer "changed into Callaway's clothes after the homicide but had to wash them before changing into them."

¶ 138    In sum, "[i]n reviewing all of the evidence presented at trial, the DNA analyzed after the trial[,] and the arguments made, the [circuit] court underst[ood] why the State ha[d] decided not to retry the case at this time with the evidence that [was] available and the burden [of proof] beyond a reasonable doubt." But "[h]aving said that, the court [could not] find that [Palmer] had proven by the preponderance of the evidence that [Palmer] ha[d] established he [was] innocent of the charge of murder." Therefore, the court denied Palmer's request for a certificate of innocence.

¶ 139    This appeal followed.

¶ 140                                    II. ANALYSIS
¶ 141              A. Proof of Innocence, Whether as a Principal or as an Accomplice
¶ 142    To win a certificate of innocence, the petitioner must prove the following four propositions by a preponderance of the evidence:

"(1) the petitioner was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;

(2)(A) the judgment of conviction was reversed or vacated, and the indictment or information dismissed or, if a new trial was ordered, either the petitioner was found not guilty at the new trial or the petitioner was not retried and the indictment or information dismissed; or (B) the statute, or application thereof, on which the indictment or information was based violated the Constitution of the United States or the State of Illinois;

(3) the petitioner is innocent of the offenses charged in the indictment or information or his or her acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State; and

(4) the petitioner did not by his or her own conduct voluntarily cause or bring about his or her conviction." 735 ILCS 5/2-702(g) (West 2018).

It is undisputed, on appeal, that Palmer proved the first, second, and fourth of those propositions (*id.* § 2-702(g)(1), (2), (4)); the dispute is whether he proved the third proposition (*id.* § 2-702(g)(3)).

¶ 143 The third proposition in section 2-702(g) is made up of two alternative propositions: "[T]he petitioner is innocent of the offenses charged in the indictment or information," or alternatively, "his or her acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State." *Id.* The act charged in the information, beating Helmbacher to death with a hammer, was a felony against the State, and Palmer has never suggested otherwise. Instead, he sought to prove he was "innocent of the offenses charged in the *** information." *Id.* Palmer, the circuit court found, had failed to carry that burden of proof: He had failed to prove, by a preponderance of the evidence, that he was "innocent of the offenses charged in the *** information." *Id.*

¶ 144 Before scrutinizing that evidentiary finding by the circuit court, we must resolve a controversy over the meaning of the statutory phrase "innocent of the offenses charged in the *** information." *Id.* The States argues, on the one hand, that the offense charged in count I of the information and of which the jury found Palmer guilty was, quite simply, the "first degree murder of William Helmbacher" and that Palmer's guilt of that offense was not dependent on his having personally wielded the hammer; he could have been equally guilty of the offense by aiding its commission, such as by being a lookout (see 720 ILCS 5/5-2(c) (West 1998); *People v. Johnson*, 318 Ill. App. 3d 281, 290 (2000)).

¶ 145 But count I, Palmer observes, did not charge him with being a lookout; rather, it charged him with personally beating Helmbacher to death. The *offense* in count I, Palmer argues, was what the count said: "FIRST DEGREE MURDER, In that the said defendant [(Palmer)], without lawful justification and with the intent to kill or do great bodily harm to William Helmbacher, repeatedly struck William Helmbacher on the head, thereby causing the death of William Helmbacher." Counts II through V likewise alleged that Palmer personally beat Helmbacher to death, and *that*, Palmer insists—and *only* that—was what he had to disprove in the civil proceeding for a certificate of innocence. In other words, by Palmer's understanding, the *offense* is not merely the statutory name "first degree murder" but also the alleged acts, set forth in counts I through V, by which Palmer allegedly committed first degree murder, and by proving—as the State conceded he proved—that he personally did not beat Helmbacher to death, Palmer proved his innocence of first degree murder *as alleged in counts I through V*, counts that did not charge him with what he regards as a different offense of aiding and abetting someone else's act of beating Helmbacher to death.

¶ 146 The State's interpretation of "offense" is, for three reasons, more convincing than Palmer's interpretation.

¶ 147 First, murdering Helmbacher by personally beating him to death and murdering him by aiding and abetting someone else's act of beating him to death are not different offenses; they are the same offense of the first degree murder of Helmbacher, as the State demonstrates by its quotation from *People v. Ceja*, 204 Ill. 2d 332, 361 (2003):

> "It is proper to charge a defendant as a principal even though the proof is that the defendant was only an accomplice. [Citations.] Courts permit this pleading practice because *accountability is not a separate offense*, but merely an alternative manner of proving a defendant guilty of the substantive offense. [Citations.]" (Emphasis added.)

- 15 -

Presumably, the legislature was aware of such cases as *Ceja* when, in 2008, the legislature added section 2-702 to the Code of Civil Procedure. See *Innovative Modular Solutions v. Hazel Crest School District 152.5*, 2012 IL 112052, ¶ 34. Therefore, the legislature presumably was aware—and absent any clear indication to the contrary in the statutory language, the legislature must have intended (see *Butler v. Harris*, 2014 IL App (5th) 130163, ¶ 28)—that an offense would be the same substantive offense regardless of whether it were committed as a principal or as an accomplice (see *Ceja*, 204 Ill. 2d at 361).

¶ 148    Second, section 2-702(g) "must be afforded its plain, ordinary[,] and popularly understood meaning" (*People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 279 (2003)), and common speech differentiates between the offense and the specific factual means of committing the offense. For example, in *People v. Strong*, 363 Ill. 602, 605 (1936), the supreme court said that "an indictment shall allege every material fact constituting the offense charged." Or, to take another example, the supreme court said in *People v. Hale*, 77 Ill. 2d 114, 120 (1979), that a criminal complaint lacking an allegation of insulting, provoking, or injurious physical contact "did not allege all the material facts constituting the offense of battery." (Internal quotation marks omitted.) So, the offense was indeed first degree murder, as the State argues, and beating Helmbacher with a hammer was merely a factual means of committing the offense.

¶ 149    Third, "[s]tatutes are to be construed in a manner that avoids absurd or unjust results" (*Croissant v. Joliet Park District*, 141 Ill. 2d 449, 455 (1990)), and it would be absurd and unjust to award a certificate of innocence to someone who, though exonerated of being the principal in a murder, is unable to prove, by a preponderance of the evidence, that he or she was innocent of being an accomplice to the murder. It would be unreasonable to award a suspected lookout, for example, the compensation (see 705 ILCS 505/8(c), 11(b) (West 2018)) and benefits (see 20 ILCS 1015/2 (West 2018)) to which a certificate of innocence would entitle its holder. After all, an accomplice is just as blameworthy, in the eyes of the law, as the principal perpetrator of the crime. See *People v. Brown*, 267 Ill. App. 3d 482, 487 (1994).

¶ 150    For those three reasons, in our *de novo* interpretation of section 2-702(g)(3) (735 ILCS 5/2-702(g)(3) (West 2018)), we conclude that to obtain a certificate of innocence on the theory that "the petitioner is innocent of the offenses charged in the indictment or information," the petitioner must prove, by a preponderance of the evidence, that he or she was neither a principal nor an accomplice in the commission of the charged offenses. See *Country Mutual Insurance Co. v. State Farm Mutual Automobile Insurance Co.*, 339 Ill. App. 3d 78, 81 (2003) (holding that issues of statutory interpretation are reviewed *de novo*). The principal and the accomplice are, in the eyes of the law, one and the same. "The acts of such other in such instances become the acts of the accused in the contemplation of law, and may be alleged so to be in the indictment." *Lionetti v. People*, 183 Ill. 253, 255 (1899).

¶ 151            B. The Unanswered Threshold Question in Palmer's Due-Process Argument

¶ 152    On the authority of *People v. Millsap*, 189 Ill. 2d 155, 166 (2000), and similar cases, Palmer argues that "[e]valuating new theories presented by the State for the first time at the [certificate of innocence] phase" violates due process. "This is because," he reasons, "once a case is submitted to a criminal jury, established law dictates that the State cannot change its theory. There is no reason to depart from that law when the State contests a petition for a [certificate of innocence]."

¶ 153     The law, in the context of a criminal trial, is that of procedural due process, which requires fair procedures leading up to the governmental deprivation of liberty. See *People v. Cardona*, 2013 IL 114076, ¶ 17. No one shall be deprived of life, liberty, or property without due process of law. U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 2. Anyone claiming a violation of procedural due process must address "the threshold question [of] whether there exists a liberty or property interest which has been interfered with by the State." (Internal quotation marks omitted.) *Segers v. Industrial Comm'n*, 191 Ill. 2d 421, 434 (2000). The constitutionally protected interest in a felony trial is obvious: the interest in liberty. The procedures leading up to the deprivation of that interest have to give the defendant "meaningful notice and a meaningful opportunity to be heard." (Internal quotation marks omitted.) *Tolliver v. Housing Authority*, 2017 IL App (1st) 153615, ¶ 22 ("The essence of procedural due process is meaningful notice and a meaningful opportunity to be heard." (Internal quotation marks omitted.)). A defendant is denied meaningful notice and a meaningful opportunity to be heard if, after the jury instructions have been settled and the parties have made their closing arguments in reliance thereon, the judge answers a note from the deliberation room by instructing the jury on a new theory of guilt, such as guilt by accountability. See *Millsap*, 189 Ill. 2d at 166. Such a procedure would be unfair to the defendant because when making his or her closing argument to the jury, the defendant never had occasion to argue against a theory of guilt by accountability; the defendant never had a reason to do so because the theory hitherto was unmentioned. Consequently, the defendant would lose his or her constitutionally protected interest in liberty without meaningful notice of a theory against him, guilt by accountability, and without a meaningful opportunity to be heard on that theory.

¶ 154     But "procedural due process protections are triggered only when a constitutionally protected liberty or property interest is at stake." *Tiller v. Klincar*, 138 Ill. 2d 1, 14 (1990). It is unclear how a constitutionally protected liberty or property interest is at stake in a proceeding for a certificate of innocence. Palmer leaves that threshold question unanswered (see *Segers*, 191 Ill. 2d at 434)—and the answer is far from obvious. He suffered no deprivation of liberty in this civil proceeding, and we do not see how, by denying him a certificate of innocence, the circuit court took any property from him. See *id.* at 435 ("The due process clause protects interests that a person *has already acquired* in specific benefits, not merely an expectation or abstract need for such benefits." (Emphasis in original and internal quotation marks omitted.)). Therefore, we conclude, *de novo* (see *People v. Hall*, 198 Ill. 2d 173, 177 (2001)), that Palmer's due process argument never gets off the ground.

¶ 155                    C. In Any Event, Procedural Fairness to Palmer

¶ 156     Even if we could overlook the unanswered threshold question of what constitutionally protected interest was at stake in this civil proceeding for a certificate of innocence, we would find no procedural unfairness. Procedurally, this case was nothing like *Millsap*.

¶ 157     The State in *Millsap*, unlike the State in this civil proceeding, had the burden of proof, and the defendant had the right to respond to all of the suggested grounds on which he might be found guilty—a right that was frustrated in *Millsap*. Here, by contrast, it was Palmer who had the burden of proof (see 735 ILCS 5/2-702(g) (West 2018)), and the State had the right to respond to *his* presentation. It makes no sense, then, to claim that Palmer, like the defendant in *Millsap*, was blindsided by a new theory of guilt and deprived of an opportunity to argue against it. It is true that, in response to Palmer's amended petition, the State raised a new theory

- 17 -

of guilt (though not a new offense), arguing there was reason to believe that Palmer was an accessory to Helmbacher's murder. But then, instead of being shut down by an unfair procedure, Palmer had a full and fair opportunity to prove and argue he was innocent of being an accessory.

¶ 158    So, there was no procedural unfairness to Palmer. He presented his evidence and arguments, the State responded, and he responded to the State's response. That is just the way a matter should proceed.

¶ 159                    D. Palmer's Invocation of the Doctrine of Judicial Estoppel

¶ 160    According to Palmer, the doctrine of judicial estoppel prohibits the State from "changing its theory of Mr. Palmer's guilt more than 20 years after his wrongful conviction." In the jury trial, the State won by taking the position that Palmer, as a principal, had beaten Helmbacher to death. Some 20 years later, in its "Response to Amended Petition for Certificate of Innocence Under 735 ILCS 5/2-702," the State took the position that Palmer "more likely than not *** participated in the homicide of William Helmbacher, either as an accessory or as a willing participant to an underlying felony that escalated into a violent attack and ultimately a homicide." An "accessory" is "[a] person who aids or contributes in the commission of a crime." Black's Law Dictionary 14 (7th ed. 1999). It is impossible to be both an accessory and a principal in the commission of murder; a person would have to be one or the other. Thus, Palmer is correct that the position the State took in the criminal trial and the position the State took later, in his proceeding for a certificate of innocence, are in that respect inconsistent.

¶ 161    The inconsistency, however, is not that of "a weather vane" pivoting whenever "the winds of self-interest change." *Department of Transportation v. Coe*, 112 Ill. App. 3d 506, 507 (1983). Instead, the inconsistency represents an honest change of mind in response to new DNA evidence, which was unavailable in the earlier, criminal proceeding. Parties that change their theory after being presented with "new evidence bearing upon the issue are not acting in bad faith"; they are not "playing 'fast and loose' with the court, the kind of conduct the doctrine [of judicial estoppel] is intended to address." *People v. Runge*, 234 Ill. 2d 68, 133 (2009). The doctrine must be carefully confined to its antihoodwinking purpose. See *Ceres Terminals, Inc. v. Chicago City Bank & Trust Co.*, 259 Ill. App. 3d 836, 850 (1994). Judicial estoppel is an "extraordinary" measure, which must be "applied with caution to avoid impinging on the truth-seeking function of the court." (Internal quotation marks omitted.) *Id.* at 857. Changes of position in response to new, previously unavailable evidence "are consistent with the court's truthfinding role" and do not trigger judicial estoppel. (Internal quotation marks omitted.) *Runge*, 234 Ill. 2d at 133. Therefore, we find no abuse of discretion in the circuit court's refusal to apply that doctrine against the State. See *Seymour v. Collins*, 2015 IL 118432, ¶ 48.

¶ 162                    E. The Claimed Inconsistency Between the
State's Present Theory and the Jury's Verdicts

¶ 163    Palmer argues that for two reasons the State could not legitimately oppose his amended petition by arguing he failed to prove his innocence of felony murder: (1) the jury acquitted him of burglary and (2) the State never charged him with robbery.

¶ 164    It is true the jury found Palmer "not guilty of residential burglary"—without qualification. The jury did not acquit him, however, of robbery, and contrary to Palmer's assertion, the State

did indeed charge him with the predicate felony of robbery (see 720 ILCS 5/2-8, 9-1(a)(3) (West 1998)): That was count IV.

¶ 165                    F. Palmer's Assertion That the Circuit Court
                    "Did Not Consider" Various Items of Evidence

¶ 166    Palmer asserts that the circuit court "did not consider" (1) exonerating DNA evidence; (2) Palmer's own assertions of innocence; (3) evidence of an alternative suspect; and (4) evidence that, on the night of the murder, Palmer was not wearing the shoes that subsequently were tested.

¶ 167    "We presume that the trial court considered all of the evidence unless the record indicates the court did not do so." *People v. $280,020 in United States Currency*, 2013 IL App (1st) 111820, ¶ 26. Not only does the record fail to rebut that presumption, but in its order, the circuit court explicitly addressed all four of the items that Palmer claims the court failed to consider. Just because those four items did not persuade the court to grant Palmer's request for a certificate of innocence, it does not follow that the court disregarded those items or failed to consider them.

¶ 168                    G. Palmer's Contention That There Is No Proof of a
                    Predicate Felony or of His Guilt by Accountability

¶ 169    In its response to Palmer's amended petition for a certificate of innocence, the State argued that, "[w]eighing the totality of the evidence, it [was] more likely than not that [Palmer] participated in the murder of William Helmbacher, either as an accessory or as a willing participant to an underlying felony that escalated into a violent attack and ultimately a homicide."

¶ 170    Because the State offered no proof that a robbery or burglary was committed on August 27, 1998, or that Palmer elicited Helmbacher's murder or aided or abetted its commission, Palmer argues that "the State did not present evidence to establish each element of the *prima facie* case" and, hence, the court abused its discretion by denying his request for a certificate of innocence.

¶ 171    We must not forget, however, that the ultimate burden of proof, this time, was on Palmer instead of on the State. Palmer had the burden of proving, by a preponderance of the evidence, that he was innocent of Helmbacher's murder. See 735 ILCS 5/2-702(g)(3) (West 2018).

           " 'A party is not required to make plenary proof of a negative averment. It is enough that he introduces such evidence as, in the absence of all counter testimony, will afford reasonable ground for presuming that the [negative] allegation is true; and when this is done, the *onus probandi* will be thrown on his adversary.' " *Upper Salt Fork Drainage District v. DiNovo*, 385 Ill. App. 3d 1083, 1097 (2008) (quoting *Graves v. Bruen*, 11 Ill. 431, 441 (1849)).

Thus, the burden of coming forward with responsive evidence shifted to the State only if Palmer *first* carried his burden of coming forward with evidence reasonably justifying a finding that he did *not* commit felony murder or murder by accountability. See *id.*

¶ 172    Palmer came forward with DNA evidence that reasonably justified a finding that he was not the primary assailant of Helmbacher. At the same time, however, Palmer had to acknowledge, in his amended petition, that upon tearing apart and retesting the Fila tennis

shoes, Lu "found three tiny 'pinpoint droplets' of blood inside of the shoes" and that "[s]ubsequent DNA testing of these droplets matched Helmbacher's blood standard." Palmer admitted that these Fila shoes were his own shoes when he argued, in his amended petition, that "[t]he only way that this blood could have appeared on *Mr. Palmer's shoes* is if it was put there." (Emphasis added.)

¶ 173    This admission by Palmer was documentary evidence. In fact, all the evidence in the civil proceeding below was documentary. There was an amended petition for a certificate of innocence, with exhibits attached; a response from the State, with exhibits attached; and Palmer's response to the State's response. And that was it. This was, essentially, a bench trial on paper, which normally would call for a *de novo* standard of review. See *Schlobohm v. Police Board*, 122 Ill. App. 3d 541, 544 (1984); *Delasky v. Village of Hinsdale*, 109 Ill. App. 3d 976, 980 (1982). The parties are in agreement, however, that the standard of review applicable to this case is the most deferential standard of review recognized by the law (see *In re D.T.*, 212 Ill. 2d 347, 356 (2004)): We should ask whether the denial of a certificate of innocence was an abuse of discretion (see *People v. McClinton*, 2018 IL App (3d) 160648, ¶ 14). Given the presence of Helmbacher's blood on Palmer's shoes and given the problems the State identified in Palmer's trial testimony, we are unconvinced it was *unreasonable* of the circuit court to find Palmer's burden of proof to be uncarried. See *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003) (a trial court abuses its discretion only if no reasonable person could take the trial court's view). It was within the range of reasonableness to find a failure by Palmer to prove he did *not* commit felony murder or murder on a theory of accountability. See *id.*

¶ 174    All that the new DNA evidence tended to prove was that Palmer was not the primary assailant; it lacked any tendency to disprove he was an accomplice to Helmbacher's murder. Bear in mind that Palmer could have been an accomplice only if he was *not* the primary assailant; therefore, disproving he was the primary assailant did not disprove he was an accomplice. People commonly are killed in robberies that go bad. There can be more than one participant in a robbery, and Helmbacher's blood was found in Palmer's shoe.

¶ 175    We acknowledge Palmer's argument that "[t]he [circuit] court gave too much weight to the shoe evidence in view of the suspicious circumstances of the shoes' forensic testing." But the State explained why the shoes were sent back to the crime laboratory for retesting: Initially, the laboratory request sheet called for testing only of the reddish brown stains on the outside of the shoes, and that initial request was contrary to Carlton's wishes; he had wanted the shoes to be examined and tested more thoroughly. To believe that the police planted Helmbacher's blood on the shoes between the first and second trips to the laboratory, one would have to believe that (1) the police had a separate stash of Helmbacher's blood and (2) the police planted pin drops of Helmbacher's blood underneath one layer or two layers of material, onto areas of the shoe that, apparently, Lu could access only by tearing the shoe apart. The planting theory would not necessarily convince every reasonable mind. See *id.*

¶ 176                                   III. CONCLUSION
¶ 177    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 178    Affirmed.

- 20 -