THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES B. PALMER, Defendant-Appellant.

Fourth District    No. 4—02—1039

Opinion filed October 8, 2004.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Scott Rueter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

In April 2000, a jury convicted defendant, Charles B. Palmer, of first degree murder (720 ILCS 5/9—1(a)(1) (West Supp. 1997)), and the trial court sentenced him to natural life in prison. In August 2002, defendant filed a *pro se* postconviction petition. In November 2002, the court summarily dismissed defendant's petition, finding his claims were frivolous and patently without merit. Defendant appeals, contending the trial court erred in summarily dismissing his postconviction petition. We affirm.

In February 1999, the State charged defendant by information with five counts of first degree murder in that defendant (1) "with the intent to kill or do great bodily harm to William Helmbacher, repeatedly struck [him] on the head, thereby causing the death of [him]" (count I); (2) "repeatedly struck [Helmbacher] on the head, knowing said act would cause the death of [Helmbacher], thereby causing the death of [him]" (count II); (3) "repeatedly struck [Helmbacher] [o]n

the head, knowing such act created a strong probability of death or great bodily harm to [Helmbacher], thereby causing the death of [him]" (count III); (4) "while committing or *** attempting to commit a forcible felony, [r]obbery, *** repeatedly struck [Helmbacher] on the head and thereby caused the death of [Helmbacher]" (count IV); and (5) "while committing or attempting to commit a forcible felony, [r]esidential [b]urglary, *** repeatedly struck [Helmbacher] on the head and thereby caused the death of [Helmbacher]" (count V) (see 720 ILCS 5/9—1(a)(1), (a)(2), (a)(3) (West Supp. 1997)). The State also charged defendant with residential burglary of Helmbacher's apartment (count VI) (720 ILCS 5/19—3 (West 1998)).

The evidence at defendant's April 2000 trial showed the following. Ray Taylor, defendant's cousin, testified that he lived upstairs in Helmbacher's apartment building in Decatur. Around dusk on August 26, 1998, defendant came to Taylor's apartment and told Taylor that he was going to break into Helmbacher's apartment. Defendant then went in the side window of Helmbacher's apartment, opened the front door, and asked Taylor to look out for him. Taylor "stood there, and then *** went upstairs" to his apartment. Shortly thereafter, defendant came upstairs to Taylor's apartment with some items, including beer and some change in a jar. He asked Taylor for a bag to put things in, and Taylor handed him a plastic garbage bag. Defendant put some of the items in the bag, and Taylor and defendant drank some of the beer. They then walked to a Dumpster a few blocks from Taylor's apartment, and Taylor threw the plastic bag in it. At that point, Taylor went to his mother's home. He did not see defendant again that night.

On the evening of August 27, 1998, Taylor saw defendant at the apartment of another cousin, John Bradford. Defendant asked Taylor to come inside Bradford's apartment. Once inside, Taylor noticed that defendant was wearing a different pair of shoes and different clothes from the previous day. Defendant said to Taylor, "Man, you know I had to beat the dude to death." Taylor asked defendant, "What dude?" and defendant replied that it was the man who lived downstairs in Taylor's building—namely, Helmbacher. Defendant also said that Helmbacher only had $11 on him on August 27. Taylor then asked defendant where his new tennis shoes were that he was wearing the previous day during the burglary, and defendant replied that "blood was everywhere."

Later that night, police officers came to Taylor's apartment and questioned him about Helmbacher's murder. Police also questioned him again on September 1, 1998. During those interviews, Taylor did not tell them that he knew anything about the murder because he did

not want to become involved. Later during September 1998, after police recovered the plastic bag containing Helmbacher's property and informed Taylor that they had found his fingerprints on the bag, he told them what he knew about defendant's participation in the burglary and Helmbacher's murder. (On September 10, 1998, a gardener at the James Millikin Homestead found a plastic bag containing empty beer bottles, a wallet, and a packet of business cards identifying Helmbacher as an attorney.)

Taylor also stated that after Helmbacher's murder, police officers showed him a pair of tennis shoes, which he identified as the shoes defendant was wearing during the August 26, 1998, burglary of Helmbacher's apartment.

Taylor acknowledged that he had been charged with residential burglary of Helmbacher's apartment (720 ILCS 5/19—3 (West 1998)), based on the August 26, 1998, burglary (Macon County case No. 98—CF—1476). Because Taylor agreed to testify for the State at defendant's trial, the State told him that his cooperation would be taken into account in case No. 98—CF—1476. However, the State had not made any promises to Taylor regarding the outcome of his case. Taylor also acknowledged that he had two prior felony convictions.

Joseph Moyer testified that in August 1998, he and Helmbacher both worked for Doug Lee. On the evening of August 27, 1998, Moyer and Lee were collecting rent from occupants of apartment buildings owned by Lee. At around 9:45 p.m., Moyer and Lee arrived at Helmbacher's apartment and knocked on the door. When no one answered, they left to collect rent at other buildings. At around 10:30 or 10:45 p.m., they returned to Helmbacher's apartment. Moyer looked through a small window in Helmbacher's front door and saw a half-eaten cheeseburger on a table and Helmbacher's shoes lying on the floor. Thinking something was wrong, Lee opened the door and found Helmbacher dead on the floor.

Moyer acknowledged that on the night of the incident, Lee was upset with Helmbacher because Helmbacher was behind in collecting rent for Lee. Moyer also acknowledged that he had a prior felony burglary conviction.

Decatur police officer Brian Cleary testified that on the evening of August 27, 1998, he responded to a call at Helmbacher's apartment. Upon arriving, he looked through a window and saw Helmbacher lying on the floor. Cleary saw no signs of forced entry.

Decatur police detective Roger Ryan testified that he investigated the crime scene on August 27 and 28, 1998. Ryan stated that the inside of Helmbacher's front door was splattered with blood and a large pool of blood had formed around Helmbacher's body. However,

Ryan did not observe bloody footprints or any blood outside Helmbacher's apartment. Ryan also stated that he found a hammer near Helmbacher's body.

Dr. Travis Hindman, a forensic pathologist, testified that he performed an autopsy on Helmbacher. Hindman opined that Helmbacher died as a result of brain trauma resulting from narrow surface blunt trauma to the head, compatible with blows from a hammer.

Mike Callaway testified that defendant spent the night with him on August 27, 1998. When defendant arrived at his apartment around 10 p.m., Callaway did not notice any blood on him. At some point, Callaway went to the liquor store. He returned about 45 minutes later and found defendant wearing one of Callaway's shirts. Callaway told defendant that he had to wash his own clothes out and wear them. Later during defendant's stay, Callaway saw defendant washing some clothes. Callaway was not sure whether he told Decatur police detective Tim Carlton that defendant had arrived at his apartment just before dark, although he acknowledged he may have.

Carlton testified that when he interviewed Callaway, Callaway said that defendant had arrived at his apartment on August 27, 1998, around dark. During a September 22, 1998, interview of defendant, Carlton noticed that defendant was wearing a pair of white tennis shoes with red specks on them. Carlton took the shoes from defendant and showed them to Taylor. Carlton then placed the shoes in the police department's evidence storage area. The shoes were later sent to the Illinois State Police crime laboratory for analysis. After initial testing indicated that no human blood was on the shoes, Carlton sent the shoes back to the crime laboratory with instructions to "take them apart" and analyze them again. Carlton testified that he did not touch the shoes before sending them back for further analysis.

Decatur police officer Roger Morville testified that during August and September 1998, he was the evidence officer. On September 24, 1998, he transported defendant's tennis shoes to the crime laboratory. After the initial testing, Morville transported the shoes from the laboratory to the police department's evidence storage area. On October 15, 1998, he again transported the shoes to the crime laboratory. At that time, the shoes were still in a sealed evidence storage bag and had not been tampered with or altered in any fashion.

Jennifer Lu, a crime laboratory employee trained in forensic biology, testified that she initially analyzed defendant's tennis shoes on September 25, 1998. She tested the red specks on the laces and outside of the shoes and determined that the stains were not human blood. On November 4, 1998, Lu reexamined the shoes at the request of the Decatur police. Lu dismantled the shoes and discovered three

stains on the right side of the right shoe (the first stain was located under a piece of leather covered with mesh and the second two stains were located under the mesh). After testing, Lu determined that the stains were human blood. Lu also stated that the police had sent Helmbacher's fingernail scrapings, which contained a blood-like substance, to the laboratory as well; however, she did not test those scrapings.

Dana Pitchford, an Illinois State Police forensic scientist, testified that she conducted a deoxyribonucleic acid (DNA) analysis of a blood standard from Helmbacher and the bloodstains found on defendant's shoes. Pitchford opined that the DNA test results indicated that the blood on defendant's shoes came from Helmbacher. The likelihood that another individual could have been the source of the bloodstains is 1 out of 42 trillion in the "White" population and 1 out of 38 trillion in the "Black" population. (Helmbacher was "White.")

Decatur police sergeant Brian Bell testified on defendant's behalf that during a September 21, 1998, interview of Taylor, Taylor admitted going into Helmbacher's apartment during the August 26, 1998, burglary. Decatur police officer Jeremy Welker testified that when he interviewed Taylor on August 28, 1998, Taylor stated that he had been home on the evening of August 27, 1998, but had not heard anything unusual.

Defendant testified and denied committing the crimes. He stated that he spent the day and night of August 26, 1998, at Taylor's apartment. He slept off and on all day because he was not feeling well. On August 27, 1998, defendant woke up sometime between 11 a.m. and noon. Around 3:30 or 4 p.m., defendant went to Callaway's apartment, where he stayed until the next day. Defendant stated that he and Callaway often wore each other's clothes, and on the morning of August 27, 1998, defendant put on a pair of Callaway's pants and a shirt. Defendant also stated that he did not loan his shoes to anyone, but someone may have worn them without his permission.

On this evidence, the jury found defendant guilty of first degree murder and not guilty of residential burglary. The trial court later sentenced him as stated.

Defendant appealed, alleging that the State failed to prove him guilty beyond a reasonable doubt of first degree murder. Specifically, he claimed that (1) Taylor's testimony was "contradictory and inherently unreliable," (2) the evidence "tend[ed] to point more towards Taylor's guilt," and (3) the only physical evidence "that in any way implicate[ed] [defendant] for this crime was trace amounts of blood" on his shoes, which were "discovered under suspicious and questionable circumstances."

In September 2001, this court affirmed the trial court's judgment. *People v. Palmer*, No. 4—00—0634, slip order at 19 (September 25, 2001) (unpublished order under Supreme Court Rule 23). In February 2002, the Supreme Court of Illinois denied defendant's petition for leave to appeal. *People v. Palmer*, 198 Ill. 2d 603, 766 N.E.2d 243 (2002).

In August 2002, defendant filed a *pro se* postconviction petition, approximately 40 pages in length, asserting (1) he was denied effective assistance of appellate counsel, (2) he was denied effective assistance of trial counsel, (3) "prosecutorial misconduct," (4) "insufficient evidence," and (5) he was not proved guilty beyond a reasonable doubt. Defendant attached to his petition more than 100 pages of "exhibits," mostly police reports.

In November 2002, the trial court summarily dismissed defendant's petition as frivolous and patently without merit. This appeal followed.

Defendant alleges the trial court erred in summarily dismissing his postconviction petition. This court reviews *de novo* a trial court's dismissal of a postconviction petition without an evidentiary hearing. *People v. Simms*, 192 Ill. 2d 348, 360, 736 N.E.2d 1092, 1105-06 (2000).

Under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122—1 through 122—8 (West 2002)), the trial court must first, independently and without considering any argument by the State, determine whether the petition is "frivolous or is patently without merit." 725 ILCS 5/122—2.1(a)(2) (West 2002). To survive dismissal at this first stage, the petition need only present "the gist of a constitutional claim," which is "a low threshold." *People v. Gaultney*, 174 Ill. 2d 410, 418, 675 N.E.2d 102, 106 (1996).

"In considering a petition pursuant to [section 122—2.1 of the Act], the [trial] court may examine the court file of the proceeding in which the petitioner was convicted, any action taken by an appellate court in such proceeding[,] and any transcripts of such proceeding." 725 ILCS 5/122—2.1(c) (West 2002). The court should examine those records to determine whether the allegations are positively rebutted by the record. That determination will assist the court in resolving the issue as to whether the petition is frivolous or patently without merit. *People v. Little*, 335 Ill. App. 3d 1046, 1051, 782 N.E.2d 957, 962 (2003).

■ Our supreme court has consistently upheld the first-stage dismissal of a postconviction petition when the record from the original trial proceedings contradicts the defendant's allegations. *People v. Rogers*, 197 Ill. 2d 216, 222, 756 N.E.2d 831, 834 (2001); see *People v. Jones*, 66 Ill. 2d 152, 157, 361 N.E.2d 1104, 1106 (1977) ("A court may also properly dismiss a post-conviction petition if the record of proceed-

ings at trial shows the petition to be nonmeritorious"); see also *People v. De Avila*, 333 Ill. App. 3d 321, 329, 775 N.E.2d 79, 85 (2002) ("courts will uphold the summary dismissal of a postconviction petition when the record from the original trial proceedings contradicts the defendant's allegations").

Additionally, a petition brought under the Act is not a direct appeal but rather a collateral proceeding that permits inquiry only into constitutional issues that defendant did not raise and could not have raised on direct appeal. Thus, issues defendant raised on direct appeal are barred from consideration by the doctrine of *res judicata*, and issues that defendant could have raised, but did not, are considered waived. *People v. Williams*, 209 Ill. 2d 227, 233, 807 N.E.2d 448, 452 (2004). A defendant cannot avoid the bar of *res judicata* by simply rephrasing issues previously addressed on direct appeal. *Simms*, 192 Ill. 2d at 360, 736 N.E.2d at 1105. However, the doctrines of *res judicata* and waiver will be relaxed in the following three circumstances: (1) where fundamental fairness so requires, (2) where the waiver stems from the ineffective assistance of appellate counsel, or (3) where the facts relating to the claim do not appear on the face of the original appellate record. *Williams*, 209 Ill. 2d at 233, 807 N.E.2d at 452.

█ In this case, defendant claims that (1) on September 25, 1998, a crime laboratory employee analyzed his tennis shoes and determined that the stains were not human blood and appellate counsel "failed to bring this information to the attention of the \*\*\* court," (2) a detective "plant[ed] blood" on defendant's tennis shoes, and (3) law enforcement officials improperly seized the tennis shoes from defendant while he was incarcerated in the county jail.

On direct appeal, this court rejected defendant's contention that the blood on his shoes was "discovered under suspicious and questionable circumstances." Defendant simply rephrases an issue previously addressed on direct appeal. A defendant cannot avoid *res judicata* by adding additional allegations that are encompassed by a previously adjudicated issue. *People v. Kimble*, 348 Ill. App. 3d 1031, 1034, 811 N.E.2d 346, 348-49 (2004). Since defendant's arguments have already been addressed, the trial court did not err in summarily dismissing defendant's postconviction petition.

Defendant next claims that he was denied his right to conflict-free counsel because the victim was an attorney. In *People v. Graham*, 206 Ill. 2d 465, 472, 795 N.E.2d 231, 236 (2003), our supreme court addressed a criminal defendant's right to conflict-free counsel as follows:

"A criminal defendant's sixth amendment right to effective representation includes the correlative right to conflict-free representation. [Citations.] Because a defendant is entitled to

> undivided loyalty from defense counsel, this court has adopted a *per se* conflict-of-interest rule. [Citation.] Under this rule, the defendant's conviction must be reversed if (1) defense counsel has an actual or potential conflict of interest stemming from a previous or current commitment to a party with interests adverse to the defendant, and (2) the defendant does not waive the conflict. [Citations.]
>
> A threshold inquiry in any conflict-of-interest case is whether, in fact, defense counsel represented or represents a party with conflicting interests to those of the defendant."

Counsel acknowledged he knew the victim "professionally" but had no previous relationship with the victim that would give rise to divided loyalties.

Defendant next claims he was denied effective assistance of trial counsel because counsel failed to call multiple named witnesses. A claim that counsel failed to investigate and call a witness must be supported by an affidavit from the proposed witness. *People v. Enis*, 194 Ill. 2d 361, 380, 743 N.E.2d 1, 13 (2000). In the absence of such an affidavit, a reviewing court cannot determine whether the proposed witness could have provided testimony or information favorable to the defendant, and further review of the claim is not necessary. *Enis*, 194 Ill. 2d at 380, 743 N.E.2d at 13. Defendant has failed to support his claim with the appropriate affidavits.

Last, defendant claims the trial court erred by "allowing [the State] to proceed to trial with insufficient evidence." Specifically, defendant argues the State failed to conduct tests on substances found under the victim's fingernails and, thus, "has imprisoned the wrong man." On direct appeal, this court rejected defendant's argument that the State failed to prove him guilty beyond a reasonable doubt of first degree murder, stating:

> "Based on the evidence that (1) defendant told Taylor that (a) he had to beat Helmbacher to death, and (b) blood was everywhere; and (2) Helmbacher's blood was found on defendant's shoes, the jury could conclude that defendant was guilty of Helmbacher's murder. Contrary to defendant's contention, the jury was not required to speculate regarding the possibility that the crime was committed by someone other than defendant. [Citation.] Reviewing the evidence presented under the appropriate standard of review, we conclude that a rational trier of fact reasonably could have found that defendant committed first degree murder." *People v. Palmer*, No. 4—00—0634, slip order at 10 (September 25, 2001) (unpublished order under Supreme Court Rule 23).

Since defendant's argument has already been addressed, the trial court did not err in summarily dismissing defendant's postconviction petition.

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

TURNER and STEIGMANN, JJ., concur.